The Kent Machine Company v. Commissioner.
Kent Mach. Co. v. Commissioner
Docket No. 8547.
United States Tax Court
1947 Tax Ct. Memo LEXIS 227; 6 T.C.M. (CCH) 441; T.C.M. (RIA) 47112; April 28, 1947
*227 John D. Wortman, Esq., and C. G. Rausch, C.P.A., 510 Metropolitan Bldg., Akron 8, Ohio, for the petitioner. Wesley Dierberger, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: Respondent determined a deficiency in income tax of petitioner for the calendar year 1941 in the amount of $5,139.94. The sole question presented for our decision is whether the respondent erroneously disallowed as a deduction the amount of $16,381.47 taken by the petitioner for "Development Costs (Abandoned)" Findings of Fact The petitioner, an Ohio corporation, was organized in 1907. Its offices are located in Cuyahoga Falls, Ohio, and its returns for the taxable year were filed with the collector of internal revenue at Cleveland, Ohio. It is engaged in the business of making complete machines and machine parts, and general machinery work. For a number of years prior to 1938, the petitioner had been producing for sale a low cost cement block-making machine, known as a "tamping machine," which sold for $700. This was a low-production machine and petitioner was desirous of securing a high-production machine. In midsummer of 1937, George J. Root *228 called at the office of petitioner with some photographs of a high-production machine for use in manufacturing cement building units, which he had invented. Root had manufactured one of these machines and it was in operation in Elmira, New York. He sought to interest petitioner in manufacturing and marketing the machine for commercial use. Petitioner's general manager visited the Elmira plant of Root, and saw the machine in operation. On December 9, 1937, an agreement was entered into between the Root Development Corporation and/or George J. Root, as licensor, and petitioner, as licensee, which, in part, provided as follows: WHEREAS, the Licensor has invented, built and perfected a machine for manufacturing concrete block, tile, brick, and other building units, for which application for Letters Patent of the United States were filed on the 24th day of December, 1934, and serially numbered 758971, and WHEREAS, the Licensee desires to manufacture, sell and/or lease building unit making machines in accordance with that disclosed in the application aforesaid, NOW, THEREFORE, for and in consideration of the sum of One Dollar ($1.00) each to the other in hand paid, the receipt of which *229 is hereby acknowledged, and the performance of the terms and conditions hereinafter set forth, licensor agrees and does hereby license licensee, subject to the terms and conditions hereinafter mentioned: 1. To make, use, sell and/or lease any and all machines embodying any inventions or improvements covered by said application for Letters Patent of the United States of America, or applications for Letters Patent, relating or pertaining to inventions or improvements which are capable of use in connection with machines for making concrete building units any right, title and interest in which has been, or during the continuance of this agreement, may be, in whole or in part, acquired by Licensor, or under any licenses acquired by Licensor relating to the same. 2. This license shall continue to the end of the terms of any patents issued upon such above mentioned application or applications for Letters Patent, and Licensor agrees that while this license remains in force Licensor will not grant any other license relating to machines for making concrete building units to any other person, firm or corporation, except as hereinafter provided. 3. If Licensor, during the continuance of *230 this agreement, shall devise or acquire any inventions or licenses relating to machines for making concrete building units, Licensor shall communicate that fact to the Licensee; will furnish Licensee with the necessary data fully to disclose said inventions and improvements, and, if requested by Licensee will execute to Licensee separate licenses for the same, under the terms of this agreement. In consideration of the above, and except during the first year, licensee agrees to sell five or more machines. In the event Licensee does not sell five machines in each year, after said first year, this contract may cease and determine, at the option of either party, upon thirty days' written notice sent by registered mail by the party desiring to terminate same, to the last known Post Office address of the other party hereto. * * *
5. The Licensee shall proceed immediately to prepare complete working drawings and designs, and do such engineering work in connection with the machine for making building units and attachments mentioned in this contract as may be necessary to enable Licensee to build such licensed machine and will have Licensee's officers and engineers consult Licensor *231 and Licensor's engineer as to changes in design and construction, to reduce manufacturing, erection and installation costs to a minimum. Licensee agrees not to make any changes in the design of said Root Machine, or improvement thereon, affecting principles of operation, without the approval and consent of the Licensor. 6. The Licensor shall furnish for the use of Licensee whatever drawings, patterns, and tools and fixtures which are now in Licensor's possession which may be useful in the design and manufacturing of the machines under this agreement. The Licensee shall not be held responsible for the condition or maintenance of any drawings, patterns, tools and fixtures delivered to Licensee under this agreement and no compensation covering the use or deterioration shall be paid by Licensee to Licensor at any time. * * *
11. From the initial payment received from each and every machine sold or leased, the Licensor shall receive One Thousand Dollars ($1000.00) from which Licensor shall pay any and all royalties to any persons or corporations to whom Licensor is obligated, and the Licensee shall receive its total cost of building and installing the machine, including patterns, *232 jigs and fixtures, plus 10%. After payment of the above items, any profit remaining shall be divided equally between Licensor and Licensee. The total cost to Licensee for the building of all machines shall be determined by the cost of material F.O.B. manufacturing plant, plus the actual cost of direct labor, plus an overhead charge of ninety-five cents (95") per hour of that direct labor, and in addition, any and all installation expense. * * *
14. Licensee acknowledges the validity of each and every patent and application, or applications, for letters patent, now owned or which may be hereafter applied for, or acquired by the Licensor. Any improvements or inventions, or applications for patents made by Licensee, or that shall be assigned to or acquired by Licensee, on the said Root block-making machine, shall, upon request of Licensor, be promptly assigned to Licensor, provided Licensor shall bear the expense of issuing Patents, and that the experimental and development expense shall be charged into the cost of manufacturing machines. After the agreement was executed, it took many months to get the drawings, and only a small portion of petitioner's plant was devoted to the *233 Root Machine in 1938. In 1939, approximately ten per cent of the plant was engaged in this work. Petitioner built and sold two Root machines in the year 1939; one machine was sold in the year 1940 and three machines were sold in the year 1941. The basic machines sold for approximately $3,500, and were made to order. On June 24, 1940, a supplemental agreement was entered into between Mr. Root and/or the Root Development Corporation, licensor, and The Kent Machine Company, licensee, modifying the agreement of December 9, 1937. The supplemental agreement provided, in part, the following: Now, therefore, in view of the difficulties arising by reason of the construction and sale of said machines, the Licensor and Licensee, by mutual consent, agree that on the first four (4) machines built, the Licensee shall be exempt from paying to Licensor the sum of One Thousand Dollars ($1000.00) for each machine sold or leased: but, in view of the fact that Licensor has separate agreements with other parties interested in the machine patent, whereby Licensor has agreed to pay to them the sum of One Hundred Twenty-five Dollars ($125.00) for each and every machine built, the Licensee agrees to pay *234 to the Licensor One Hundred Twenty-five Dollars ($125.00) for each of the first four (4) machines built, instead of One Thousand Dollars ($1000.00) per machine, as stipulated in Paragraph 11 of the original agreement. And it is also mutually agreed that the Licensee shall not be bound to sell five (5) machines or more until after the third year, instead of after the first year, as set forth in the second part of Paragraph 3 in the original agreement. After entering into the agreement of December 9, 1937, the petitioner opened an account on its books entitled "Development - Kent Root Vibra." The expenditures charged to this account were engineering costs, drawings, material, labor, shop overhead, tools, patterns, traveling and miscellaneous other small items. A portion of the labor cost in making the parts for the Root machines was charged to development. If two parts to be used on machine were made at the same time, the cost of one part might be charged to the development account and the other placed in an inventory account and become a part of inventory cost. The traveling expenses charged to the Root development account consisted of expenditures made by petitioner's engineers *235 on trips to the Root plant at Elmira, N. Y., to see his machine in operation, expenditures on trips to leading block plants to see what changes might be necessary to adapt machine to the character of work they were carrying on, and expenditures by executives on trips to conventions of the Concrete Masonry Association, where discussions were had with potential customers to determine the problems of the industry and acquaint them with the Root machine. The petitioner purchased one-sixth of a page of advertising each month for the Root machine in the magazine "The Pit and Quarry" at a cost of about $30.00 a month. The advertising cost on the Root machine was charged to the Root machine development account. A portion of petitioner's indirect charges or overhead was also charged to the Root development account. The amount of overhead charged to the development account was determined by taking the total overhead costs of the petitioner and dividing by the total amount of direct labor hours on all the work in the petitioner's shop, which gives the rate per hour for overhead charges. That rate per hour for overhead charges was then multiplied by the number of direct labor hours worked *236 in the production of the Root machine. Every manufacturing expense ordinarily chargeable to overhead, such as taxes on the factory, depreciation on the equipment, insurance, payroll taxes on the shop labor, etc., was thus reflected in the development account. The cost of tools and patterns used in the production of the Root machine was charged to the development account. All parts that were not serviceable or which broke in the making of Root machines were charged to the development account. At the end of the year 1940, the total expenditures charged to the development account amounted to $19,398.95. No amounts were charged to the development account after July 31, 1940. The petitioner made a small amount of money in 1937 and lost money in 1938 and 1939. The petitioner made a profit in the years 1940 and 1941. The major items included in the development account are as follows: (a) Traveling expense
$ 4,251.16
(b) Advertising
1,975.57
(c) Engineering costs, parts,
material, direct labor,
factory overhead, tools,
etc.
13,172.22
TOTAL
$19,398.95
During the years 1938 to 1941, inclusive, $300 for each machine sold was credited to the development account, *237 making a total of $1,800 for the six machines sold during that period. In addition, the account was credited in the separate amounts of $1,067.48 and $150, having to do with a mixer which was built for one of these machines. This left a balance of $16,381.47 which was charged off in the account on December 31, 1941, and deducted in the petitioner's income tax return for the year 1941. During the three years petitioner manufactured and sold Root machines it made some improvements in their design. Through the introduction of heavier shafts and bearings petitioner succeeded in eliminating some of the breakages previously experienced. By stiffening the structural frame, it remedied to some extent the weaving of the machine. It changed the location of the feed and chute, and in order to secure a more even distribution of material in the mold box a different type of metal was used on the chute. Petitioner also made a change in a latch-up mechanism. In October 1941, the petitioner disposed of materials on hand for the manufacture of the Root machine. Patterns were broken up and burned, and materials on hand, such as jigs, tools and fixtures were put into a scrap pile and sold as scrap. *238 In the middle of 1941, the petitioner started to manufacture a hydraulic machine that was used for the purpose of making cement blocks. The hydraulic machine operated on a different principle from the Root machine, but made the same unit. Opinion In support of his determination that the petitioner should not be permitted to deduct in the taxable year 1941, expenditures made in the years 1937 to 1940, inclusive, in connection with the Root machine, the respondent contends that these expenditures were not development expenditures incurred in the development of that machine but were ordinary and necessary expenses incurred in the production and sale of the machine which were deductible in the year in which made. Respondent also urges that the petitioner has not established that it had a loss in the taxable year 1941, since at the end of that year it still had all of its rights under the license agreement. Petitioner on brief urges that there are but two questions in this proceeding (1) whether its "development costs, incurred in the development of the Kent Root Vibra machine, constitute capital expenditures," and (2) whether it abandoned the "development of said machine in 1941." *239 Thus, petitioner in his statement of the questions involved, assumes a fact that the respondent challenges, i.e., that the expenditures made on the Root machine were development expenditures. Even if it be assumed that some part of the expenditures made by petitioner in connection with the Root machine could be properly classified as development costs, it would be impossible on the basis of the evidence submitted to segregate those which are clearly not development costs from those that might fall into this classification. The expenditures charged to petitioner's development account have not been broken down, with the exception of traveling expenses in the amount of $4,251.16 and advertising in the amount of $1,975.57. Engineering costs, parts, materials, direct labor, factory overhead, tools, etc., are all lumped together and make up the remainder of $13,172.22 in the account. Our findings show the nature of the trips which occasioned the traveling expenditures; what the evidence discloses concerning advertising expenditures; the charges made to the development account for amounts expended in making parts for the Root machines; and the method employed by petitioner of charging *240 a portion of overhead costs to the development account, without any offsetting credit, even though paragraph 11 of the licensing agreement provided that petitioner was to receive from the sales price of each machine the actual cost of direct labor on the machine, plus an overhead charge of ninety-five cents per hour of that direct labor. No detailed discussion of these expenditures is required. Suffice to say, that petitioner has not proven to our satisfaction that they were incurred in the development of the machine and were not proper charges to cost of production and sale. We do not deem it necessary, however, to bottom our decision on failure of proof because it clearly appears to us from the evidence that petitioner did not enter into the agreement of December 9, 1937 for the purpose of developing patents, inventions or improvements in the Root machine. It acquired from Root a license to make, use, and/or lease this machine, and for this license Root was to receive $1,000 for each machine sold or leased. The agreement does not indicate, as petitioner urges on brief, that the parties realized "that extensive development work was needed." It simply recognizes that some engineering *241 work would be necessary in order to enable petitioner to manufacture the machine, and that some changes in design might be necessary "to reduce manufacturing, erection and installation costs to a minimum." It also provides that the licensor, and not petitioner, acquires the right to any improvements, inventions or patents discovered in connection with the manufacture of the machine, and provision is made that any "experimental and development expense shall be charged into the cost of manufacturing machines." We think it is obvious from the foregoing that such expenditures as petitioner may have made for the purpose of improving the Root machine and facilitating its production could not result in the acquisition by it of any capital asset. It had no patent on the machine nor any right of a patent for any change or idea that might evolve in the production of the machine. Our conclusion, therefore, is that the expenditures charged to the development account were not capital expenditures, but were expenditures deductible in the year made. Cases cited and relied upon by petitioner are Forest Products Chemical Company, 27 B.T.A. 638, aff'd C.C.A. 6, December 18, 1934, without *242 written opinion, cert. denied 294 U.S. 726; Dresser Manufacturing Co., 40 B.T.A. 341; Acme Products Co., 24 B.T.A. 194; Dempster Mill Mfg. Co. v. Burnett, 46 Fed. (2d) 604; Ward v. United States, 32 Fed. Supp. 743. In none of these cases do we have a situation comparable to that in the instant proceeding in which a corporation, operating under a license to manufacture, sell and lease a machine, made some improvements or corrections therein which could not and did not result in the acquisition of any capital asset, and the cost of which under the terms of the license agreement had to be charged into the cost of manufacturing the machine. The conclusion we have reached renders it unnecessary to discuss the respondent's alternative contention that petitioner has not established that it had a loss in 1941, since at the end of that year it still had all of its rights under the license agreement. We have held that the expenditures in question were not capital expenditures. They were not, therefore, deductible in the year in which petitioner abandoned the sale of the Root machine. No part of such expenditures were deductible *243 in 1941 as they were all made prior to August 1, 1940. Decision will be entered for the respondent